[Cite as *State ex rel. Barnes v. Indus. Comm.*, 2016-Ohio-824.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Thelma Barnes, | : | |
| Relator, | : | |
| v. | : | No. 15AP-170 |
| The Industrial Commission of Ohio and Stark County Community Action Agency, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

_____

D E C I S I O N

Rendered on March 3, 2016

_____

**On Brief:** *Bevan & Associates, LPA,* and *Christopher J. Stefancik,* for relator.

**On Brief:** *Michael DeWine*, Attorney General, and *Lisa R. Miller,* for respondent Industrial Commission of Ohio.

**On Brief:** *Day Ketterer Ltd.,* and *R. Clint Zollinger, Jr.,* for respondent Stark County Community Action Agency.

_____

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

BRUNNER, J.

{¶ 1} Relator, Thelma D. Barnes ("Barnes"), has filed this original action and petitioned for a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that denied her temporary total disability ("TTD") compensation beginning November 12, 2013, based on the commission's determination that she had voluntarily abandoned her employment with respondent Stark County

No. 15AP-170

Community Action Agency ("SCCAA"), and ordering the commission to find that she is entitled to the requested compensation.

{¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law, and recommended that this court deny Barnes' request for a writ of mandamus. Barnes filed objections to the magistrate's decision.

{¶ 3} Barnes presents the following objections to the magistrate's decision:

> Relator objects to Magistrate's determination that the Staff Hearing Officer did not render a factual finding that Relator's termination was the result of inadvertently violating a work rule/policy. Said finding is not consistent with a reasonable interpretation of the plain language in the Staff Hearing Officer's Order. Relator further objects to the Magistrate's Decision in that it attempts to supply this supposedly missing factual determination on behalf of the Staff Hearing Officer. The Magistrate's Decision contains blatant factual errors regarding the evidence relied upon, and regardless, it is improper for this Court to supply factual findings where the Industrial Commission is the exclusive evaluator of evidentiary weight. Finally, Relator objects to the Magistrate's Decision in that it improperly focuses on the "physical activity" of leaving the child in an empty classroom, [sic] to establish that Relator's violation of the work rule/policy was not inadvertent. The proper analysis must consider Relator's reasonable but erroneous belief that the classroom was not empty. For these reasons Relator request [sic] that the Court reject the Magistrate's Decision and grant issuance of the requested writ.

{¶ 4} The major thrust of Barnes' objections to the magistrate's decision is that the commission's staff hearing officer ("SHO") found that her violation of the work rule/policy was inadvertent and erroneous and that this finding was ignored by the magistrate, who did not reach a finding that the commission erred in applying the voluntary abandonment doctrine to her conduct. Barnes asserts that, for purposes of workers' compensation laws, it is not permissible to hold a claimant accountable for her erroneous or inadvertent conduct that results in the violation of an employer's written policies.

No. 15AP-170

{¶ 5} For the reasons set forth below, Barnes' objections are overruled, and the magistrate's decision is adopted by the court.

{¶ 6} Barnes sustained a work-related injury on September 26, 2012, which resulted in her workers' compensation claim being allowed for "sprain lumbar region" and "herniated discs L4-5, L5-S1." (Agreed Stipulations, 2-4.)

{¶ 7} At the time of her injury, Barnes was employed by SCCAA as a transportation aide for Head Start. On September 11, 2012, Barnes had signed a form acknowledging that she had reviewed the company's Child Care Center licensing rules with the program administrator; that she knew where a copy of the rules was located for further review; and that she had received orientation training on a variety of subjects specific to her position, including "child management techniques and expectations," "who I will be responsible for," "active supervision of children," and "attendance requirements." (Agreed Stipulations, 122.)

{¶ 8} SCCAA has a written policy entitled, "Safety of Children-Chain of Custody." The policy provides specific procedures to be followed by a child care staff member in charge of any child, including the following:

> A child care staff member in charge of a child or group of children shall be responsible for their safety.
>
> All children shall be supervised as outlined in rule 5101:2-17:27 of the administrative code, (sic) no child shall be left alone or unsupervised.
>
> * * *
>
> When dropping the children off or picking the children up from the classroom, the driver and aides must sign-in and sign out each child from the classrooms.
>
> The following rules shall apply,
>
> * * *
>
> The driver and aid [sic] will then lead the children to the classroom. Each child is taken to the classrooms and then transferred to the center staff. The center staff signature is required on the passenger check list at the time each child is taken to his/her classroom.

(Agreed Stipulations, 123.) The policy specifies that "[v]iolations of this procedure will warrant immediate suspension and/or termination." (Agreed Stipulations, 123.)

No. 15AP-170

{¶ 9}   Additionally, SCCAA has a "Zero Tolerance Policy" that specifically provides in pertinent part as follows:

> **Purpose:**
>
> Limits are necessary to maintain children safe and healthy at all times while in the care of the Head Start program staff.
>
> This policy is designed to reduce the risk of harm to children while being transported to and from the centers, in the learning environment of the classroom, outdoors, field trips and other activities designed for preschoolers.
>
> **Policy:**
>
> If a complaint or incident occurs with a Head Start children) (sic) where an employee is found to have violated regulations established by The Ohio Department of Job and Family Services (ODJFS) which governs the licensure and compliance of preschool daycares, the employee will be terminated with just cause.
>
> **Zero Tolerance policy overs the following behaviors:**
>
> * * *
>
> A child left alone and not actively supervised by a SCCAA employee during any activities, held in the inside or outside premises of a SCCAA Head Start facility.

(Agreed Stipulations, 121.)

{¶ 10} On April 9, 2013, Barnes delivered a child to a classroom, but left the child alone in the hallway outside the classroom.  The child entered the classroom and, finding no one there, stepped back into the hallway, where a teacher found her. Barnes, seeing the child and teacher's encounter, asked the teacher if she had been in the classroom.  The teacher replied she had not been in the classroom.  Barnes self-reported the incident in a handwritten note dated April 9, 2013:

> At about 9:25 or 9:27 Bus 32 came in. I Thelma Barnes signed Yanitza into classroom 17.  I didn't know that no one was in the room. Mrs. Campbells sign in board is int the hallway. There wasn't a note or anything outside the door letting me know that no one was in the room. I proceeded to Rm 16 and I turned around and I seen Mrs. Campbell with the child. I asked Mrs. Campbell you wasn't in the room. her class was in the orchestra. Yanitza & Mrs. Campbell where in the hallway

door standing. I proceeded to tell Bety myself what had occurred. I'm very sorry and take responsibility for what happened.

(Sic passim.) (Agreed Stipulations, 124.)

{¶ 11} An incident report signed by SCCAA supervisor Betty Thompson on April 9, 2013, indicated that Barnes was written up for safety rules/practices and carelessness. The report contained the following statement:

Thelma Barnes a Program Aid [sic] on 4/9/2013 @ 9:30 came to Site Supervisor to report her leaving a child unsupervised in a classroom. Ms. Barnes sent a child into a classroom without proper supervision. Child was left alone. Procedure of custody of child was followed after child was attended to.

(Agreed Stipulations, 126.) The incident report recommended Barnes' immediate dismissal.

{¶ 12} In a letter dated April 22, 2013, SCCAA notified Barnes that her employment had been terminated:

You have been terminated from employment effective April 18, 2013, due to the violation of the Zero Tolerance Policy that requires staff to maintain children safe at all times. The incident of April 9th, 2013 was investigated which resulted in confirmation that you did not obtain the teacher's signature on the custody paper work required when you deliver a child to the classroom, consequently the child was left alone in the classroom until the Teacher saw her in the hallway, she then joined the rest of the class.

(Agreed Stipulations, 128.)

{¶ 13} Barnes applied for unemployment benefits on April 19, 2013. On May 8, 2013, the Ohio Department of Jobs and Family Services ("ODJFS") issued a notice of a determination granting Barnes' application. The notice stated the basis of the determination as follows:

[Barnes] was discharged by STARK COUNTY COMMUNITY ACTION AGENCY (INC) on 04/18/2013. The employer discharged [Barnes] for violating a company rule. The employer failed to establish negligence or willful disregard of the rule on the part of [Barnes]. Ohio's legal standard that determines if a discharge is without just cause is whether [Barnes'] acts, omissions, or course of conduct were such that an ordinary person would find the discharge not justifiable. After a review of the facts, this agency finds that [Barnes] was

> discharged without just cause under Section 4141.29(D)(2)(a), Ohio Revised Code.

(Agreed Stipulations, 48.)  The record does not indicate what, if any, information SCCAA submitted to ODJFS in connection with Barnes' application for unemployment benefits.

{¶ 14}  Barnes, a union member, filed a grievance regarding her termination, and a grievance meeting was held on May 22, 2013.  In a letter dated May 28, 2013, SCCAA affirmed its decision to terminate her:

> In response to the Grievance meeting on May 22nd,* * * there is no change to your employment termination effective April 18, 2013.
>
> Your request for reconsideration based on self-reporting this incident, and the change of the location for the sign-in sheet which you feel caused the incident was reviewed with Ms. Goss, HS Director. The reason for no change is due to the seriousness of the incident in which [sic] violated "The Zero Tolerance Policy" implemented in August 2011. This policy has been cause for termination to those employees that have left a child unattended without the supervision of a staff member. In your specific incident, you did not take the child into the classroom (left outside the classroom) to perform your change of custody duties with the Teacher. Because you did not perform this required job function as Program Aide, you did not see the notice left for you to take the child to another classroom where they were attending a concert. The child remained alone in the classroom until she stepped out into the hallway and was then redirected to join her classroom.
>
> The parents of the Head Start Program entrust their children's safety to the staff at SCCAA, therefore management must maintain a Zero Tolerance Policy for incidents that jeopardize the safety of the children.

(Agreed Stipulations, 129.)

{¶ 15}  Thereafter, on November 12, 2013, Barnes' physician, Mark R. Grubb, M.D., examined her for the allowed conditions arising from the prior-covered September 26, 2012 injury and subsequently submitted a Physician's Request for Medical Service, Form C9, requesting certain medical procedures. SCCAA approved the application, and Barnes underwent surgery on December 9, 2013.

No. 15AP-170

{¶ 16} On January 22, 2014, Barnes' treating physician of record, John Pinghero, D.C., submitted a Physician's Report of Work Ability form, Form MEDCO-14, indicating that Barnes was temporarily disabled from any work from the date of surgery, December 9, 2013.

{¶ 17} On January 22, 2014, Barnes filed a request for temporary total disability ("TTD") compensation beginning November 12, 2013.

{¶ 18} On January 28, 2014, Dr. Grubb submitted a Physician's Report of Work Ability form, MEDCO-14, indicating that Barnes was temporarily disabled from any work from November 12, 2013.

{¶ 19} In an order mailed March 4, 2014, the Ohio Bureau of Workers' Compensation referred for hearing Barnes' application for TTD compensation to the commission, based on SCCAA's assertions that Barnes had been terminated effective April 18, 2013 for violating a work rule/policy, and that she had not worked or sought work since her termination date.

{¶ 20} A district hearing officer ("DHO") heard Barnes' request on March 26, 2014. The DHO allowed the request, noting that the file contained only a copy of SCCAA's Zero Tolerance Policy, with nothing to indicate that it had been given to Barnes, and an unsigned copy of the termination letter. The DHO found no evidence of Barnes "ever having received or acknowledged a written handbook containing this specific work rule," and concluded that there was insufficient evidence that established that Barnes was terminated "for violation of a written work rule which she knew or should have known would result in her termination which was consistent was the decision in [*State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995)]." (Agreed Stipulations, 51.)

{¶ 21} SCCAA appealed, and a staff hearing officer ("SHO") heard the appeal on May 2, 2014. The SHO vacated the prior DHO order and denied Barnes' request for TTD compensation, finding that Barnes' testimony at the hearing supported a determination that she had voluntarily abandoned her employment, and that she had not re-entered the workforce following her termination. The SHO concluded that Barnes had failed to show that she was entitled to TTD compensation:

> Temporary total compensation is denied from 11/12/2013 through 05/02/2014. [Barnes] has failed to substantiate she is

No. 15AP-170

eligible for the receipt of temporary total compensation during this period. The evidence in file reflects [Barnes] was terminated on or about 04/18/2013 for violation of a written work policy. This termination was tantamount to a voluntary abandonment of employment.

The evidence presented at hearing indicated that [Barnes] was employed by the named employer as a transportation aide for Head Start. [Barnes] testified she dropped a child off to a classroom on 04/09/2013, erroneously thinking a teacher was present, and inadvertently left the child unattended in the classroom.

[Barnes] also testified she was aware of the employer's Zero Tolerance Policy which mandated staff maintain the safety of children at all times. [Barnes] testified that when she discovered her error, she reported herself to her supervisors as she was aware the employer had a strict policy regarding the safety of children. [Barnes] further testified that she was aware that leaving a child alone or unattended was a dischargeable offense.

The employer has submitted a copy of its Zero Tolerance Policy wherein it expressly indicates a child who is left alone and not actively supervised by an employee is a violation of the policy and a dischargeable offense. [Barnes] does not dispute knowledge of this policy or her failure to comply with it.

The Staff Hearing Officer finds [Barnes'] termination from employment under the above-noted circumstances is tantamount through [sic] a voluntary abandonment of employment under the holding of *State ex rel. Louisiana-Pacific Corp. v. Industrial Commission* (1995), 72 Ohio St.3d 401. The employer had a written policy which apprised its employees of a standard of conduct. The violation of this conduct was expressly indicated to be a terminable offense. [Barnes] acknowledged knowing of both the existence of this policy and the consequences of her actions.

No evidence was presented at hearing that [Barnes] has returned to work in any capacity since being terminated on or about 04/18/2013. Therefore, based on her termination, which amounts to a voluntary abandonment of employment, and the absence of re-entry into the workforce, [Barnes] is not

No. 15AP-170

> eligible for the payment of temporary total compensation for
> the time period 11/12/2013 through 05/02/2014.

(Agreed Stipulations, 60-61.)

{¶ 22} By order mailed June 6, 2014, the commission refused Barnes' appeal of the SHO order.

{¶ 23} Barnes then filed a request for reconsideration, alleging that the SHO had failed to apply the appropriate legal analysis to the facts in evidence and had incorrectly found that Barnes had voluntarily abandoned her employment. Barnes argued that the voluntary abandonment doctrine did not apply because she had not intended to violate the written work rule, and that her conduct was neither voluntary nor willful, but inadvertent.

{¶ 24} In an interlocutory order mailed July 21, 2014, the commission granted Barnes' request for reconsideration, stating:

> It is the finding of the Industrial Commission [that Barnes] has presented evidence of sufficient probative value to warrant adjudication the Request for Reconsideration regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is sought, and a clear mistake of law of such character that remedial action would clearly follow.
>
> Specifically, it is alleged that in denying [Barnes'] request for temporary total disability compensation, the Staff Hearing Officer misinterpreted the standard set forth in *State ex rel. Louisiana-Pacific Corp. v. Indus. Commn.*, 72 Ohio St.3d 401, 650 N.E.2d 469 (1995), regarding the circumstances under which termination of employment may properly be deemed a voluntary abandonment of employment such as to preclude entitlement to temporary total disability compensation.
>
> The order issued 06/06/2014 is vacated, set aside, and held for naught.

(Agreed Stipulations, 110.)

{¶ 25} After a hearing on October 21, 2014, the commission determined that it did not have authority to exercise continuing jurisdiction, effectively denying Barnes' application for TTD benefits:

> After further review and discussion, it is the finding of the Industrial Commission it does not have authority to exercise continuing jurisdiction pursuant to R.C. 4123.52 and *State ex*

No. 15AP-170

> *rel. Nicholls v. Indus. Comm.*, 81 Ohio St.3d 454, 692 N.E.2d 188 (1998), *State ex rel. Foster v. Indus. Comm.*, 85 Ohio St.3d 320, 707 N.E.2d 1122(1999), and *State ex rel. Gobich v. Indus. Comm.*, 103 Ohio St.3d 585, 2004-Ohio-5990, 817 N.E.2d 398. [Barnes] has failed to meet her burden of proving sufficient grounds exist to justify the exercise of continuing jurisdiction. Therefore, [Barnes'] Request for Reconsideration, filed 06/25/2014, is denied, the refusal order, issued 06/06/2014, is reinstated, and the Staff Hearing Officer order, issued 05/15/2014, remains in full force and affect.

(Agreed Stipulations, 137.)

{¶ 26} Barnes filed this action in mandamus on the grounds that the SHO's decision denying her TTD compensation was defective and contained a clear mistake of law, and that the commission's refusal to exercise continuing jurisdiction to correct the defect was improper and warranted the requested writ.

{¶ 27} The magistrate recommends in the attached decision that this court deny Barnes' request for a writ of mandamus for the reason that Barnes has not shown that she has a clear legal right to the relief sought from the commission or that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 28} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of the objection, we overrule Barnes' objections and adopt the magistrate's findings of fact and conclusions of law. To be entitled to relief in mandamus, Barnes must establish that she has a clear legal right to relief and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967), paragraph nine of the syllabus. To do so, she must demonstrate that the commission abused its discretion and, "in this context, abuse of discretion has been repeatedly defined as a showing that the commission's decision was rendered without some evidence to support it." *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18, 20 (1987).

{¶ 29} Barnes does not dispute that she had left a child alone and unsupervised outside a classroom, conduct that she knew violated a written work policy and constituted grounds for termination. Rather, Barnes disputes the nature of her action, arguing that she did not intend to leave the child alone and unsupervised and thus had not intended to

violate the work rule/policy. She argues that she should not be held accountable for her unintentional violation of the written work rule/policy.

{¶ 30} The magistrate's decision contains a comprehensive review of the case law that evolved into the current voluntary abandonment doctrine as manifested in *Louisiana-Pacific* and subsequent decisions that have expounded on that holding. *Louisiana-Pacific* stands for the proposition that termination of employment can constitute voluntary abandonment when it is "generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee." *Id.* at 403. Voluntariness can be imputed to a claimant's misconduct only under such conditions. *State ex rel. Brown v. Hoover Universal, Inc.*, 132 Ohio St.3d 520, 2012-Ohio-3895, ¶ 1. The magistrate's decision, however, also notes that, "because of the potential for abuse, a postinjury firing must be carefully scrutinized. Written termination criteria aid this inquiry and are why *Louisiana-Pacific* requires them." *State ex rel. McKnabb v. Indus. Comm.*, 92 Ohio St.3d 559, 562 (2001).

{¶ 31} The magistrate's decision contains a review of how courts have distinguished between conduct that gives rise to "voluntary" and "involuntary" separation and, with respect to the present case, the magistrate concluded:

> Examining the present facts, we find it difficult to characterize as "involuntary" a termination generated by [Barnes'] violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with *Ashcraft* and *Watts* – i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
>
> [Barnes] contends that her termination should not be deemed a voluntary abandonment because the termination was not the result of voluntary misconduct that she willingly undertook, but conduct which was inadvertent or accidental. In support of her argument, [Barnes] directs this court's attention to its decision in *State ex rel. Feick v. Wesley*

No. 15AP-170

> *Community Servs.*, 10th Dist. No. 04AP-166, 2005-Ohio-3986.

(Magistrate's Decision,¶ 75-76.)

{¶ 32} The magistrate found Barnes' reliance on *State ex rel. Feick v. Wesley Community Servs.*, 10th Dist. No. 04AP-166, 2005-Ohio-3986 misplaced, noting that the *Feick* court had held that "while there are scenarios where a claimant should not be held accountable for a negligent act, there are also scenarios where it is permissible to hold a claimant accountable for his or her negligence and/or careless acts." *Id.* at ¶ 3.

{¶ 33} The magistrate determined that there was some evidence in the record from which the commission could determine that Barnes' termination did constitute a voluntary abandonment. Specifically, the magistrate noted the following:

> While [Barnes] acknowledges the seriousness of her actions, she asserts that this was the only time she dropped off a child without following the specific protocol for ensuring that the child had been delivered to the proper adult. [Barnes] asserts that, not only was her action inadvertent, the action did not demonstrate any type of careless pattern discussed in *Feick*. Further, [Barnes] asserts that the commission made a specific finding that her action was inadvertent based on her erroneous assumption the teacher was present in the classroom.
>
> The magistrate finds that there is some evidence in the record from which the commission could determine that [Barnes'] termination did constitute a voluntary abandonment. The policy specifically required [Barnes] to leave the child in the presence of an adult and that a signature was required. The policy required certain action on [Barnes'] part: leaving the child with a teacher and receiving a signature indicating that the child was properly accounted for. [Barnes] specifically failed to take those two steps. The "nature" of her inaction is extremely serious: the safety of children. There is no evidence in the record that her employer did not actually follow the procedures. As such, the action which caused [Barnes'] violation of a policy was her failure to take specific action. She left the child outside the classroom unattended. It certainly can be said that she willfully or voluntarily walked away from that child without ensuring the child was supervised. [Barnes] failed to take the acts necessary to ensure that the child was properly and safely supervised. It cannot be said that she inadvertently forgot to perform this act.

(Magistrate's Decision, ¶ 78-79.)

No. 15AP-170

{¶ 34} The magistrate was not persuaded by Barnes' argument that the commission, through its SHO, had determined that her action in leaving the child alone was "erroneous" and "inadvertent," and that the voluntary abandonment doctrine should not apply to her violation of SCCAA's written work rule because her conduct was neither voluntary nor willful.

> In the present case, the magistrate finds that [Barnes] dropped the child at the school without transferring her to a center staff member as required by the rule. The commission never made a finding that her action was inadvertent. Instead, the commission used that language solely to describe [Barnes'] testimony. Stark County's zero tolerance policy clearly emphasizes the importance of maintaining the safety of the children at all times and employees who violate the policy regarding child safety will be terminated with just cause. [Barnes'] failure to take specific steps was a voluntary act and the magistrate finds that the commission's determination is supported by some evidence.

(Magistrate's Decision, ¶ 81.)

{¶ 35} The magistrate has noted in the attached decision that this court has held that Barnes' conduct, although not willful, could rise to such a level of indifference or disregard for workplace rules and policies as to support a finding for voluntary abandonment. *State ex rel. Parraz v. Diamond Crystal Brands, Inc.*, 141 Ohio St.3d 31, 2014-Ohio-4260, ¶ 13. The Supreme Court of Ohio in *Parraz* also, however, makes the following observation:

> An employee's violation of a work rule or policy need not be willful or deliberate, but merely a voluntary act that the employee knew may lead to termination of employment. *State ex rel. Brown v. Hoover Universal, Inc.*, 132 Ohio St.3d 520, 2012-Ohio-3895, 974 N.E.2d 1198, ¶ 11; *Watts* at 121; *Louisiana-Pacific* at 403. With respect to negligent or careless actions that result in termination of employment, "there may be situations in which the nature or degree of the conduct, though not characterized as willful (e.g., repeated acts of neglect or carelessness by an employee), may rise to such a level of indifference or disregard for the employer's workplace rules/policies to support a finding of voluntary abandonment." *State ex rel. Feick v. Wesley Community Servs.*, 10th Dist. Franklin No. 04AP-166, 2005-Ohio-3986, ¶ 6. These cases are fact driven and must be determined on a case-by-case basis. *Id.* at ¶ 4.

No. 15AP-170

*Parraz* at ¶ 16. The injured worker employee in *Parraz* committed repeated workplace violations relating to attendance and did not offer evidence whether her attendance problems related to her injury. Here, Barnes was apparently a conscientious employee who self-reported her single act of inadvertence. However, the nature of the infraction was admittedly more serious—so serious, according to SCCAA policy, that it warranted termination the first time it was committed.

{¶ 36} In reviewing Barnes' case in the manner prescribed by *Parraz,* on a "case-by-case basis," we find it difficult to factually find an exception from the Supreme Court's holding in *Parraz.* The record contains evidence of Barnes' testimony that she was aware of the written policy; that she knew that leaving a child alone and unsupervised was cause for discharge under the SCCAA's Zero Tolerance Policy; and that, when she realized she had violated the policy, she promptly reported the violation to her supervisor. We hold this evidence satisfies the criteria of the *Louisiana-Pacific.* Consequently, the commission's denial of TTD compensation was not an abuse of discretion and can stand.

{¶ 37} Upon review of the magistrate's decision, an independent review of the record, and due consideration of relator's objection, we find the magistrate has properly stated the pertinent facts and applied the appropriate law. Therefore, we overrule relator's objection to the magistrate's decision and adopt the decision as our own, including the findings of facts and conclusions of law therein, in accordance with the magistrate's decision, we grant respondent's motion to dismiss relator's petition for writ of mandamus.

*Objections overruled;*
*writ of mandamus denied.*

TYACK and KLATT, JJ., concur

————————————

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Thelma Barnes, | : | |
| Relator, | : | |
| v. | : | No. 15AP-170 |
| The Industrial Commission of Ohio and Stark County Community Action Agency, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

MAGISTRATE'S DECISION

Rendered on October 28, 2015

---

*Bevan & Associates, LPA,* and *Christopher J. Stefancik,* for relator.

*Michael DeWine*, Attorney General, and *Drew Alatis,* for respondent Industrial Commission of Ohio.

*Day Ketterer Ltd.,* and *R. Clint Zollinger, Jr.,* for respondent Stark County Community Action Agency.

---

IN MANDAMUS

{¶ 38} Relator, Thelma Barnes, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order which denied her application for temporary total disability ("TTD") compensation based on a finding that she had voluntarily abandoned her employment with respondent, Stark County Community Action Agency ("employer"

No. 15AP-170

or "Stark County"), and ordering the commission to find that she is entitled to that compensation.

Findings of Fact:

{¶ 39} 1. Relator sustained a work-related injury on September 26, 2012 and her workers' compensation claim has been allowed for the following conditions: "sprain lumbar region; herniated discs L4-5, L5-S1."

{¶ 40} 2. At the time of injury, relator was employed by Stark County as a transportation aide for Head Start children.

{¶ 41} 3. On September 11, 2012, relator signed a form acknowledging that she had received copies of the company's home/parent and employee information, home, medical, dental, and general emergency plan, that she had received orientation training involving various safety measures specific to her position, which included the following topics: "[c]hild management techniques and expectations, [w]ho I will be responsible for, including names and age, [a]ctive supervision of children, [and] [a]ttendance requirements."

{¶ 42} The written policy specifically provides that, when a child gets off the bus:

> The driver and aid[e] will then lead the children to the classroom. Each child is taken to the classrooms and then transferred to the center staff. The center staff signature is required on the passenger check list at the time each child is taken to his/her classroom.

{¶ 43} Further, the policy provides that "[v]iolations of this procedure will warrant immediate suspension and/or termination."

{¶ 44} Further, the employer has a zero tolerance policy which specifically provides, in pertinent part:

> **Purpose:**
>
> Limits are necessary to maintain children safe and healthy at all times while in the care of the Head Start program staff.
>
> This policy is designed to reduce the risk of harm to children while being transported to and from the centers, in the learning environment of the classroom, outdoors, field trips and other activities designed for preschoolers.

**Policy:**

> If a complaint or incident occurs with a Head Start (children) where an employee is found to have violated regulations established by the Ohio Department of Jobs Ohio and Family Services (ODJFS) which governs the licensure and compliance of pre-school daycares, the employee will be terminated with just cause.

{¶ 45} 4. On April 9, 2013, relator dropped off a child outside of a classroom, unattended, and without a supervisor or other staff member present. Apparently, the child then entered the classroom and was alone in the classroom until she stepped out into the hallway and a teacher saw her. In a note written April 9, 2013, relator explained, in her own words, what happened:

> At about 9:25 or 9:27 bus 32 came in. I Thelma Barnes signed Yanitza into classroom 17. I didn't know that no one was in the room. Mrs. Campbell's sign in board is in the hallway[.] There wasn't a note or anything outside the door letting me know that no one was in the room. I proceeded to [room] 16 and I turned around and I seen Mrs. Campbell with the child. I asked Mrs. Campbell you wasn't in the room. [H]er class was in the orchestra. Yanitza [and] Mrs. Campbell [were] in the hallway door standing. I proceeded to tell Betty myself what had occurred. I'm very sorry and take responsibility for what happened.

{¶ 46} 5. In a letter dated April 22, 2013, relator was notified that she was terminated as follows:

> You have been terminated from employment effective April 18, 2013, due to the violation of the Zero Tolerance Policy that requires staff to maintain children safe at all times. The incident of April 9th, 2013 was investigated which resulted in confirmation that you did not obtain the teacher's signature on the custody [paperwork] required when you deliver a child to the classroom, consequently the child was left alone in the classroom until the Teacher [sic] saw her in the hallway, she then joined the rest of the class.

{¶ 47} 6. Relator, as a union member, filed a grievance and the employer notified relator that its decision to terminate her did not change. In a May 28, 2013 letter, relator was informed:

No. 15AP-170

In response to the Grievance meeting on May 22nd, at 4:30 p.m. at William Hunter where you were represented by Chris Dandrow, Union President, there is no change to your employment termination effective April 18, 2013.

Your request for reconsideration based on self-reporting the incident, and the change of location for the sign-in sheet which you feel caused the incident was reviewed with Ms. Goss, HS Director. The reason for no change is due to the seriousness of the incident in which violated "The Zero Tolerance Policy" implemented in August 2011. This policy has been cause for termination to those employees that have left a child unattended without the supervision of a staff member. In your specific incident, you did not take the child into the classroom (left outside the classroom) to perform your change of custody duties with the Teacher [sic]. Because you did not perform this required job function as Program Aide, you did not see the notice left for you to take the child to another classroom where they were attending a concert. The child remained alone in the classroom until she stepped out into the hallway and was then redirected to join her classroom.

The parents of the Head Start Program entrust their children's safety to the staff at SCCAA, therefore management must maintain a Zero Tolerance Policy for incidents that jeopardize the safety of the children.

{¶ 48} 7. Eight months later, on December 9, 2013, relator underwent back surgery and relator's treating physician's signed Physician's Report of Work Ability forms indicating that relator was unable to work from the date of surgery and continuing.

{¶ 49} 8. On January 23, 2014, relator filed a request for TTD compensation.

{¶ 50} 9. In an order mailed March 4, 2014, the Ohio Bureau of Workers' Compensation ("BWC") referred the claim to the commission for consideration.

{¶ 51} 10. Relator's request for TTD compensation was heard before a district hearing officer ("DHO") on March 26, 2014 and was allowed. Specifically, the DHO order states:

Prior to a discussion on the merits, the representative for the Injured Worker clarified the period of disability requested for adjudication at today's hearing. The period requested is

from 11/12/2013 through the date of today's hearing and continuing.

This file contains evidence that the Employer is relying on an argument of voluntarily abandonment which they allege impacts the Injured Worker's right to receive temporary total disability compensation. The file contains one page of apparently a handbook providing for a zero tolerance paragraph. There is no evidence of the Injured Worker ever having received or acknowledged a written handbook containing this specific written work rule. Further, there is a termination letter which is unsigned by her Employer. This Hearing Officer finds there is insufficient evidence which establishes that this Injured Worker was terminated for violation of a written work rule which she knew or should have known would result in her termination which is consistent with the decision in [*State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995)]. Further, present on behalf of the Employer was a third party administrator who was unable to present a legal argument on this issue.

It is ordered temporary total disability compensation shall be paid for the period 11/12/2013 through 03/26/2014 and continuing upon submission of medical proof certifying disability based on the recognized conditions in this claim. This Injured Worker underwent surgery in this claim by Dr. Grubb on 12/09/2013. Dr. Grubb provides a Medco-14 which disables this Injured Worker for the period commencing 11/12/2013 through 03/11/2014. Further, this file contains a Medco-14 from Dr. Pinghero dated 03/19/2014 which also disables this Injured Worker.

{¶ 52} 11. Stark County appealed and, on May 2, 2014, a hearing was heard before a staff hearing officer ("SHO"). At that time, the SHO vacated the prior DHO order and denied relator's request for TTD compensation finding that her termination from her job constituted a voluntarily abandonment of employment under *Louisiana-Pacific* and, inasmuch as she had not returned to any employment after her termination, the SHO concluded that she was not entitled to an award of TTD compensation. Specifically, the SHO stated:

Temporary total compensation is denied from 11/12/2013 through 05/02/2014. The Injured Worker has failed to substantiate she is eligible for the receipt of temporary total compensation during this period. The evidence in file reflects

No. 15AP-170

Injured Worker was terminated on or about 04/18/2013 for violation of a written work policy. This termination was tantamount to a voluntary abandonment of employment.

The evidence presented at hearing indicated the Injured Worker was employed by the named employer as a transportation aide for Head Start. The Injured Worker testified she dropped a child off to a classroom on 04/09/2013, erroneously thinking a teacher was present, and inadvertently left the child unattended in the classroom.

The Injured Worker also testified she was aware of the employer's Zero Tolerance Policy which mandated staff maintain the safety of children at all times. The Injured Worker testified that when she discovered her error, she reported herself to her supervisors as she was aware the employer had a strict policy regarding the safety of children. The Injured Worker further testified that she was aware that leaving a child alone or unattended was a dischargeable offense.

The employer has submitted a copy of its Zero Tolerance Policy wherein it expressly indicates a child who is left alone and not actively supervised by an employee is a violation of the policy and a dischargeable offense. The Injured Worker does not dispute knowledge of this policy or her failure to comply with it.

The Staff Hearing Officer finds the Injured Worker's termination from employment under the above-noted circumstances is tantamount through a voluntary abandonment of employment under the holding of State ex rel. Louisiana-Pacific Corp. v. Industrial Commission (1995), 72 Ohio St.3d 401. The employer had a written policy which apprised its employees of a standard of conduct. The violation of this conduct was expressly indicated to be a terminable offense. The Injured Worker acknowledged knowing of both the existence of this policy and the consequences of her actions.

No evidence was presented at hearing that the Injured Worker has returned to work in any capacity since being terminated on or about 04/18/2013. Therefore, based on her termination, which amounts to a voluntary abandonment of employment, and the absence of re-entry into the workforce, the Injured Worker is not eligible for the payment of

No. 15AP-170

temporary total compensation for the time period 11/12/2013 through 05/02/2014.

{¶ 53} 12. Relator's appeal was refused by order of the commission mailed June 6, 2014.

{¶ 54} 13. Thereafter, relator filed a request for reconsideration arguing that she had not intended to violate the written work rule and that her action was neither voluntary nor willful, but inadvertent, and the voluntary abandonment doctrine should not apply.

{¶ 55} 14. In an interlocutory order mailed July 12, 2014, the commission determined that relator presented evidence of sufficient probative value to warrant adjudication, stating:

> It is the finding of the Industrial Commission the Injured Worker has presented evidence of sufficient probative value to warrant adjudication of the Request for Reconsideration regarding the alleged presence of a clear mistake of fact in the order from which reconsideration is sought, and a clear mistake of law of such character that remedial action would clearly follow.
>
> Specifically, it is alleged that in denying the Injured Worker's request for temporary total disability compensation, the Staff Hearing Officer misinterpreted the standard set forth in State ex rel. Louisiana-Pacific Corp. v. Indus. Comm., 72 Ohio St.3d 401, 650 N.E.2d 469 (1995), regarding the circumstances under which termination of employment may properly be deemed a voluntary abandonment of employment such as to preclude entitlement to temporary total disability compensation.
>
> The order issued 06/06/2014 is vacated, set aside, and held for naught.

{¶ 56} 15. Following a hearing on October 21, 2014, the commission declined to exercise its continuing jurisdiction and reinstated the prior SHO order effectively denying relator's application for TTD compensation.

{¶ 57} 16. Thereafter, relator filed the instant mandamus action in this court.

No. 15AP-170

Conclusions of Law:

{¶ 58} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 59} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 60} TTD compensation awarded pursuant to R.C. 4123.56 has been defined as compensation for wages lost where a claimant's injury prevents a return to the former position of employment. Upon that predicate, TTD compensation shall be paid to a claimant until one of four things occurs: (1) claimant has returned to work; (2) claimant's treating physician has made a written statement that claimant is able to return to the former position of employment; (3) when work within the physical capabilities of claimant is made available by the employer or another employer; or (4) claimant has reached maximum medical improvement. *See* R.C. 4123.56(A); *State ex rel. Ramirez v. Indus. Comm.*, 69 Ohio St.2d 630 (1982).

{¶ 61} This case must be considered within the historical context in which the voluntary abandonment doctrine has developed. In *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.*, 29 Ohio App.3d 145, 504 (1985), Ernesto Rosado sustained a work-related injury. At some point in time, Rosado voluntarily retired from his job with Jones & Laughlin. Based on Rosado's voluntary retirement, Jones & Laughlin argued in this court that Rosado should not be entitled to an award of TTD compensation. Because Jones & Laughlin had failed to raise the issue before the commission, this court denied

No. 15AP-170

Jones & Laughlin's request for a writ of mandamus ordering the commission to vacate its award of TTD compensation; however, this court did address the issue of whether or not an employee's voluntary retirement from the workforce for reasons unrelated to an industrial injury precludes the payment of TTD compensation.

{¶ 62} After citing the syllabus rule of Ramirez, this court stated that:

> [T]he industrial injury must not only be such as to render the claimant unable to perform the functions of his former position of employment, but it also must prevent him from returning to that position. * * *

*Id.* at 147.

{¶ 63} Thereafter, this court set forth the issue before it:

> Accordingly, the issue before us is whether a person who has voluntarily taken himself out of the work force and abandoned any future employment by voluntarily retiring is prevented from returning to his former position of employment by an industrial injury which renders him unable to perform the duties of such former position. This raises an issue of causal relationship.

*Id.*

{¶ 64} Ultimately, this court concluded as follows:

> [O]ne who has voluntarily retired and has no intention of ever returning to his former position of employment is not prevented from returning to that former position by an industrial injury which renders him unable to perform the duties of such former position of employment. A worker is prevented by an industrial injury from returning to this former position of employment where, but for the industrial injury, he would return to such former position of employment. However, where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued temporary total disability benefits since it is his own action, rather than the industrial injury, which prevents his returning to such former position of employment. Such action would include such situations as the acceptance of another position, as well as voluntary retirement.

*Id.*

{¶ 65} It was not until *State ex rel. Ashcraft v. Indus. Comm.*, 34 Ohio St.3d 42 (1987), that the foundation for the voluntary abandonment doctrine as we know it today

No. 15AP-170

began to take shape. In that case, Nelson C. Ashcraft was injured while working in the scope of his employment as a welder and received TTD compensation for a period of time. After his TTD compensation ceased, Ashcraft was incarcerated in West Virginia on a felony charge, subsequently convicted and imprisoned for first degree murder. Thereafter, Ashcraft sought TTD compensation from the commission.

{¶ 66} The commission ordered Ashcraft's motion suspended until he was released from incarceration. As such, Ashcraft was precluded from receiving any TTD compensation while incarcerated.

{¶ 67} Ashcraft filed a mandamus action in this court seeking an order compelling the commission to hear the application for TTD compensation. This court granted the writ and the matter was appealed to the Supreme Court of Ohio.

{¶ 68} After considering the purpose of TTD compensation and considering the holding from *Jones & Laughlin,* the *Ashcraft* court, at 44, reiterated that the crux of the decision in *Jones & Laughlin* was:

> The crux of this decision was the court's recognition of the two-part test to determine whether an injury qualified for temporary total disability compensation. The first part of this test focuses upon the disabling aspects of the injury, whereas the latter part determines if there are any factors, other than the injury, which would prevent the claimant from returning to his former position. The secondary consideration is a reflection of the underlying purpose of temporary total compensation: to compensate an injured employee for the loss of earnings which he incurs while the injury heals. * * *

{¶ 69} The *Ashcraft* court concluded that when a claimant has voluntarily removed himself or herself from the workforce, he or she no longer suffers a loss of earnings because he or she is no longer in a position to return to work. The court concluded that this logic would apply whether the claimant's abandonment of his position was temporary or permanent. Ultimately, the court concluded that Ashcraft's incarceration constituted a factor which, independently of his previously recognized work-related injury, precluded his receipt of TTD compensation. In so finding, the *Ashcraft* court stated, at 44:

> While a prisoner's incarceration would not normally be considered a "voluntary" act, one may be presumed to tacitly accept the consequences of his voluntary acts. When a

No. 15AP-170

> person chooses to violate the law, he, by his own action, subjects himself to the punishment which the state has prescribed for that act.

{¶ 70} In *State ex rel. Rockwell Internatl. v. Indus. Comm.*, 40 Ohio St.3d 44 (1988), the court again considered whether or not retirement should preclude the payment of TTD compensation. In that case, Rollin Sharp sustained a low back injury in the course of his employment with Rockwell International. TTD compensation was paid until such time as Sharp was released to return to light-duty work. Ultimately, Sharp retired from his employment, but, thereafter, filed an application to reactivate his claim and requested TTD compensation. Rockwell International argued that TTD compensation should not be paid to Sharp because he had voluntarily retired from his employment.

{¶ 71} Ultimately, the Supreme Court of Ohio found that TTD compensation was payable based upon the commission's finding that Sharp's retirement was causally related to his industrial injury, and thus was not voluntary. Specifically, the *Rockwell* court stated, at 46:

> Neither *Ashcraft* nor *Jones & Laughlin* states that any abandonment of employment precludes payment of temporary total disability compensation; they provide that only voluntary abandonment precludes it. While a distinction between voluntary and involuntary abandonment was contemplated, the terms until today have remained undefined. We find that a proper analysis must look beyond the mere volitional nature of a claimant's departure. The analysis must also consider the reason underlying the claimant's decision to retire. We hold that where a claimant's retirement is causally related to his injury, the retirement is not "voluntary" so as to preclude eligibility for temporary total disability compensation.

{¶ 72} In 1995, the Supreme Court of Ohio decided the seminal case of *Louisiana-Pacific.* In that case, Patrick Longmore sustained an injury while in the course of his employment with Louisiana-Pacific Corporation, a self-insured employer under Ohio's workers' compensation laws, who began paying TTD compensation. Longmore was released to return to work on December 17, 1990; however, he did not report to work nor did he call in on December 17, 18, or 19, 1990. In a letter dated

No. 15AP-170

December 20, 1990, Louisiana-Pacific notified Longmore that his failure to report to work for three consecutive days violated the company's policy and he was terminated.

{¶ 73} The commission awarded Longmore TTD compensation and this court denied Louisiana-Pacific's request for a writ of mandamus.

{¶ 74} On appeal, the Supreme Court of Ohio granted the writ of mandamus after finding that Longmore's termination did bar his receipt of TTD compensation. Specifically, the *Louisiana-Pacific* court stated, at 403:

{¶ 75} Recognizing the parallels underlying incarceration and firing, we observed in *State ex rel. Watts v. Schottenstein Stores Corp.*, 68 Ohio St.3d 118, 121 (1993):

> We agree that firing can constitute a voluntary abandonment of the former position of employment. Although not generally consented to, discharge, like incarceration, is often a consequence of behavior that the claimant willingly undertook, and may thus take on a voluntary character. * * *

{¶ 76} Examining the present facts, we find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with *Ashcraft* and *Watts*—i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.

{¶ 77} Relator contends that her termination should not be deemed a voluntary abandonment because the termination was not the result of voluntary misconduct that she willingly undertook, but conduct which was inadvertent or accidental. In support of her argument, relator directs this court's attention to its decision in *State ex rel. Feick v. Wesley Community Servs.*, 10th Dist. No. 04AP-166, 2005-Ohio-3986.

{¶ 78} Emily Feick was terminated from her employment after negligently causing a traffic accident while operating an employer-owned vehicle. The magistrate concluded that negligent acts cannot constitute grounds to find that an injured worker has voluntarily abandoned a position of employment; however, this court found that conclusion was "improperly overbroad" and that "while there are scenarios where a claimant should not be held accountable for a negligent act, there are also scenarios

No. 15AP-170

where it is permissible to hold a claimant accountable for his or her negligence and/or careless acts." *Id.* at ¶ 3. This court explained further:

> In the present case, respondent-employer had a company policy providing for discharge of an employee following a third violation of a "Class I" offense, which included offenses defined as "[c]arelessness, negligence or irresponsibility." As noted by the magistrate, on two prior occasions, claimant had negligently backed a van into another vehicle, and negligently placed the wrong key in the ignition of a van, causing damage to the van. Claimant's third incident, ultimately giving rise to her discharge, involved entering an intersection against a red traffic light.
>
> The magistrate found no evidence in the record that the claimant's act of running a red light was willful, and neither do we. We decline, however, to adopt a per se rule that no form of negligent conduct leading to an employee's discharge could ever constitute a voluntary abandonment of employment. Rather, as suggested by the commission, there may be situations in which the nature or degree of the conduct, though not characterized as willful (e.g., repeated acts of neglect or carelessness by an employee), may rise to such a level of indifference or disregard for the employer's workplace rules/policies to support a finding of voluntary abandonment. We do not find, however, that the facts of this case involve either willful or other conduct constituting voluntary abandonment.

*Id.* at ¶ 5-6.

{¶ 79} While relator acknowledges the seriousness of her actions, she asserts that this was the only time she dropped off a child without following the specific protocol for ensuring that the child had been delivered to the proper adult. Relator asserts that, not only was her action inadvertent, the action did not demonstrate any type of careless pattern discussed in *Feick*. Further, relator asserts that the commission made a specific finding that her action was inadvertent based on her erroneous assumption the teacher was present in the classroom.

{¶ 80} The magistrate finds that there is some evidence in the record from which the commission could determine that relator's termination did constitute a voluntary abandonment. The policy specifically required relator to leave the child in the presence of an adult and that a signature was required. The policy required certain action on

relator's part: leaving the child with a teacher and receiving a signature indicating that the child was properly accounted for. Relator specifically failed to take those two steps. The "nature" of her inaction is extremely serious: the safety of children. There is no evidence in the record that her employer did not actually follow the procedures. As such, the action which caused relator's violation of a policy was her failure to take specific action. She left the child outside the classroom unattended. It certainly can be said that she willfully or voluntarily walked away from that child without ensuring the child was supervised. Relator failed to take the acts necessary to ensure that the child was properly and safely supervised. It cannot be said that she inadvertently forgot to perform this act.

{¶ 81} Recently, this court decided *State ex rel. Parraz v. Indus. Comm.,* 10th Dist. No. 11AP-806, 2013-Ohio-764. In that case, Elana Parraz violated her employer's attendance policy which stated that employees would be terminated if a total of 14 points were accumulated due to excessive absences. Following her termination, Parraz filed a request for TTD compensation based upon a newly allowed condition and the commission denied her request based upon her voluntary abandonment. Parraz had argued that her absences were neither willful nor intentional. This court agreed with its magistrate's determination that, although not willful, Parraz's conduct did rise to such a level as indifference or disregard for workplace rules and policies as to support a finding for voluntary abandonment.

{¶ 82} In the present case, the magistrate finds that relator dropped off the child at the school without transferring her to a center staff member as required by the rule. The commission never made a finding that her action was inadvertent. Instead, the commission used that language solely to describe relator's testimony. Stark County's zero tolerance policy clearly emphasizes the importance of maintaining the safety of the children at all times and employees who violate the policy regarding child safety will be terminated with just cause. Relator's failure to take specific steps was a voluntary act and the magistrate finds that the commission's determination is supported by some evidence.

No. 15AP-170

{¶ 83} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it denied relator's request for TTD compensation, and this court should deny her request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).